UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WENDY PAYNE,

       Plaintiff,

v.                                 Case No. 3:19-cv-1173-J-32MCR

SEMINOLE ELECTRIC COOPERATIVE,
INC.,

       Defendant.

_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant's Motion to Compel

Independent Medical Examination ("Motion") (Doc. 34) and Plaintiff's Response

in Opposition thereto ("Response") (Doc. 42). For the reasons stated herein, the

Motion is due to be **DENIED**.

### I. Background

Plaintiff worked as a Human Resources Generalist for Defendant from

1981 until her termination on June 27, 2018. (Doc. 1 at ¶¶ 9, 23.) On October

16, 2019, she brought this action, alleging disability discrimination in violation of

the Americans with Disabilities Act of 1990 ("ADA") and the Florida Civil Rights

Act of 1992 ("FCRA"), age discrimination in violation of the Age Discrimination in

Employment Act of 1967 ("ADEA") and the FCRA, and discrimination and

retaliation in violation of the Family Medical Leave Act ("FMLA"). (*See generally*

*id.*) The Complaint alleges that as a result of Defendant's unlawful

discrimination, Plaintiff "has suffered and continues to suffer damages," and prays for back pay and benefits, interest thereon, front pay and benefits, compensatory damages, pecuniary and non-pecuniary losses, punitive damages, liquidated damages, costs, and attorney's fees.  (*Id.* at 5-9; *see also id.* at 8 (seeking "[c]ompensatory damages for emotional pain and suffering" as part of Plaintiff's age discrimination claim under the FCRA).)

The Complaint also alleges, in relevant part, that Plaintiff was unknowingly exposed to X-ray radiation between 300 and 390 times for three days in July of 2007 during her employment with Defendant when an X-ray machine was brought in and used in the room adjacent to Plaintiff's office without a lead barrier.  (*Id.* at ¶¶ 10-11.)  As a result of this exposure, Plaintiff allegedly became very sick and was diagnosed with "radiation poisoning, peripheral neuropathy, polyneuropathy, axonal neuropathy, and loss of motor control," among other conditions.  (*Id.* at ¶ 12.)  The Complaint further alleges that Plaintiff "still experiences extreme pain, burning, and throbbing all over the front of her body, legs, arms, hands, and feet, as well as incontinence and loss of bowel control, as a result of the radiation exposure," and "will have an increased risk of cancer for the rest of her life."  (*Id.*)

## II.   The Parties' Arguments

In the present Motion, Defendant requests an order authorizing an independent medical examination of Plaintiff by Christopher T. Kalkines, Psy.D. at a mutually convenient time and place to address Plaintiff's "mental health [and]

any long-lasting emotional or mental issues Plaintiff [] allegedly experiences as a result of her discharge."  (Doc. 34 at 1.)  Defendant argues that Plaintiff has placed her conditions associated with the 2007 radiation exposure incident at issue when she alleged that Defendant discriminated and retaliated against her due to, *inter alia*, the 2007 incident.  (*Id.* at 2.)  Defendant explains:

> Plaintiff's comments and testimony on the 2007 incident give rise to claims of extreme emotional distress and concerns that warrant an independent medical examination into Plaintiff's mental state.  More specifically, in a journal produced by Plaintiff following the 2007 incident[,] Plaintiff has made a number of alarming statements highlighting concerns regarding her mental state[,] including:
>
> - "I get very confused . . . I feel very disoriented."  (Exhibit 4, Payne 117).
> - "I catch myself, repeating sentences or words, two or three times in a row . . . I made several statements that made absolutely no sense today."  (Exhibit 4, Payne 117).
> - "I feel drugged and stupid."  (Exhibit 4, Payne 118).
> - "My body and mind is [sic] worn out.  I don't know how much longer I can keep this up."  (Payne 119).
> - "Lack of appetite.  Lack of energy.  Incredible irritability.  I have no patience left."  (Exhibit 4, Payne 131).
> - "My usual personality is not there[,] and I feel like half a person."  (Exhibit 4, Payne 131).
>
> In addition[] to these statements[,] indicative of her mental health concerns, Plaintiff also alleges that at this time she was being followed, . . . her home was "entered numerous times without any signs of forced entry" and her horse was injured by unknown individuals.  (Exhibit 4, Payne 131).  She confirmed this paranoia during her deposition testimony alleging that there existed a "goon squad" that "burned houses down" and that she had concerns that this may occur related to her own claims.  (Exhibit 2, 211-212).

(Doc. 34 at 2-3.)  Defendant argues that "regardless of the particulars in [Plaintiff's] pleadings, she has demonstrated through testimony and her discovery

responses that she is alleging greater than merely normal emotional distress,

thereby warranting a medical examination for Defendant to determine, to what

extent, if any, Plaintiff has emotional distress damages." (*Id.* at 4.)  According to

Defendant, "Plaintiff's descriptions of her claims show an individual suffering from

potential mental health conditions associated therewith." (*Id.*)

Plaintiff responds that she has not put her mental condition "in controversy"

and Defendant has not shown "good cause" to compel her mental examination.

(Doc. 42 at 1.)  She explains:

> Plaintiff has not pled any specific psychological conditions other than
> "garden variety" emotional distress.  At no point in her deposition did
> Plaintiff testify that the events that gave rise to this cause of action
> have caused her mental illness which would have placed her mental
> state in controversy, nor did she allege in her filings a specific mental
> or psychiatric injury or disorder.

(*Id.* at 3.)  She adds:

> Defendant is attempting to use Plaintiff's <u>physical</u> injuries she
> sustained from [the radiation exposure] incident 13 years ago to
> compel a <u>mental</u> examination in this case.  All of the evidence that
> Defendant cites to compel a psychiatric examination (e.g., Plaintiff's
> journal entries, medical referrals) took place many years before
> Plaintiff's termination—in other words, Plaintiff's injuries sustained in
> that incident are not the injuries for which Plaintiff is seeking
> compensation in this lawsuit.  Moreover, those injuries were physical
> in nature—not psychological.

(*Id.* (emphasis in original).)

## III.    Standard

Under Rule 35(a), "on motion for good cause," a court "may order a party

whose mental or physical condition . . . is in controversy to submit to a physical

or mental examination by a suitably licensed or certified examiner."  Fed.R.Civ.P. 35(a).  The order "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed.R.Civ.P. 35(a)(2)(B).

The two key predicates for ordering a Rule 35(a) examination, namely, the "in controversy" requirement and the "good cause" requirement, "are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination."  *Robinson v. Jacksonville Shipyards, Inc.*, 118 F.R.D. 525, 527 (M.D. Fla. 1988) (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964) and *In re Mitchell*, 563 F.2d 143 (5th Cir. 1977)).

"The majority of courts have held that plaintiffs do not place their mental condition in controversy merely by claiming damages for mental anguish or 'garden variety' emotional distress."  *Stevenson v. Stanley Bostitch, Inc.*, 201 F.R.D. 551, 553 (N.D. Ga. 2001); *U.S. EEOC v. FLTVT, LLC*, No. 6:05-cv-1452-Orl-28KRS, 2007 WL 9719122, *2 (M.D. Fla. May 18, 2007); *see also Robinson*, 118 F.R.D. at 531 ("Plaintiff does not place her mental condition in controversy by alleging that her psychological well[-]being . . . is seriously affected by defendants' behavior.").  "Garden-variety emotional distress has been described by one court as 'ordinary or commonplace emotional distress,' that which is

'simple or usual.'  In contrast, emotional distress that is not garden variety 'may be complex, such as that resulting in a specific psychiatric disorder.'"  *Chase v. Nova Se. Univ., Inc.*, No. 11-61290-CIV, 2012 WL 1936082, *3 (S.D. Fla. May 29, 2012) (citing *Ruhlmann v. Ulster Cnty. Dep't of Soc. Servs.*, 194 F.R.D. 445, 449 n.6 (N.D.N.Y. 2000)).  "Another court has characterized garden-variety claims for emotional distress and mental anguish as 'claims of generalized insult, hurt feelings, and lingering resentment' that 'do not involve a significant disruption of the plaintiff's work life and rarely involve more than a temporary disruption of the claimant's personal life.'"  *Chase*, 2012 WL 1936082 at *3 n.4 (citing *Javeed v. Covenant Med. Cir., Inc.*, 218 F.R.D. 178, 179 (N.D. Iowa 2001)); *see also Zinaman v. Kingston Reg'l Senior Living Corp.*, No. 1:11-cv-388, 2014 WL 282633, *2 (N.D.N.Y. Jan. 23, 2014) (stating that "garden variety emotional distress refers to anxiety, humiliation, shame, embarrassment, mental suffering, and distress that may flow naturally from an event that is an affront to one's dignity").

Most courts "also recognize that a mental exam is warranted when one or more of the following factors are present":

> (1)     a tort claim is asserted for intentional or negligent infliction of emotional distress;
> (2)     an allegation of a specific mental or psychiatric injury or disorder is made;
> (3)     a claim of unusually severe emotional distress is made;
> (4)     plaintiff intends to offer expert testimony in support of claim for emotional distress damages; and/or
> (5)     plaintiff concedes that her mental condition is in controversy within the meaning of Rule 35.

*Stevenson*, 201 F.R.D. at 554; *see also Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs*, 315 F.R.D. 612, 614 (N.D. Fla. 2016) (same); *Chase*, 2012 WL 1936082 at *4 (same).  "Even where these five factors have not been expressly recognized, 'most cases [allowing] mental examinations . . . involve[] a separate tort claim for emotional distress or an allegation of ongoing severe mental injury.'" *Stevenson*, 201 F.R.D. at 554; *see also Winstead*, 315 F.R.D. at 614 (noting as also important, besides the five factors, "any 'allegation of present, ongoing, or permanent mental injury or disorder'").

"[A]bsent one or more of these conditions, the plaintiff's mental state is not even 'in controversy' within the meaning of Rule 35."  *Winstead*, 315 F.R.D. at 614-15.  However, the five factors cited above "should not be seen as exhaustive, nor should the presence of any one (or more) of them automatically lead to a finding that a plaintiff has put her mental state into controversy."  *Id.* at 615.  Instead, "[t]he ultimate question is whether a plaintiff is making a claim for damages related to emotional distress that differs substantially from the typical claim in similar cases—that is, the question is whether the plaintiff's claim is a 'garden-variety' one."  *Id.*

When the "in controversy" requirement is satisfied, the court must determine if the movant has also shown "good cause" for the examination.  *See* Fed.R.Civ.P. 35(a); *Winstead*, 315 F.R.D. at 616 (stating that the two requirements under Rule 35(a), namely, the "in controversy" requirement and the

"good cause" requirement, "are distinct and implicate different concerns").  "One factor that is relevant to the determination of 'good cause' is the possibility of obtaining the desired information by other means."  *Winstead*, 315 F.R.D. at 616.  "When the 'desired information' is in essence a treating physician/therapist/psychologist's records and opinions about a party's mental injuries, disclosure of those records and opinions—together with the opportunity to depose the party and perhaps the treater—offers a less intrusive means of obtaining similar (if not the same) information."  *Id.*  "In contrast, a plaintiff who submits to an evaluation by an expert chosen by her lawyer is not seeking treatment—she's trying to advance her litigation position.  Forcing such a plaintiff to submit to a similar examination conducted by a different expert (one likely chosen by the opposing party) is not a punishment, but a leveling of the playing field."  *Id.* at 616 n.3.

"Even if good cause is shown [under Rule 35(a)(2)(A)], it is still within the court's discretion to determine whether to order an examination."  *Id.* at 616-17 (internal quotation omitted).  The *Winstead* court noted that some psychological examinations have a relatively limited probative value, which counsels against allowing the examination.  *Id.* at 617.  Thus, "[i]f a party thinks the opposing party is exaggerating the extent of her mental injuries, rigorous questioning at a deposition and scrutiny of medical records seems at least as good a way of confirming that suspicion as a quasi-objective psychological exam."  *Id.*  However, if a plaintiff denies the opposing party access to treating records, citing

some privilege, or claims a long list of psychological symptoms, many of which are non-generic, or claims that she cannot work at all, or offers her own retained expert's assessment of mental injuries based on some exam, "there would likely be 'good cause' for ordering a psychological exam, *and* ordering such an exam would serve the interests of justice even considering the policy goals behind anti-discrimination statutes."  *Id.* (emphasis in original).

## IV.   Analysis

Here, Defendant has not met its burden of showing that Plaintiff's mental condition is in controversy for the purpose of authorizing a Rule 35(a) mental examination.  Defendant argues that Plaintiff has placed her conditions associated with the 2007 radiation exposure incident at issue by alleging that Defendant discriminated and retaliated against her due to that incident.  Although Plaintiff claims that Defendant retaliated against her due to the radiation exposure, Plaintiff alleges that the retaliation, rather than the radiation exposure, caused her the emotional pain and suffering for which she seeks relief in this action.  (*See generally* Doc. 1; *see also* Doc. 34-4 at 14 ("I feel it is retaliation from being exposed to the radiation, because I am now a liability.").)  In other words, although Plaintiff seeks compensatory damages for "emotional pain and suffering" as part of her age discrimination claim under the FCRA (Doc. 1 at 8), there is no indication that the damages sought stem directly from the 2007 radiation exposure incident, but rather from Defendant's alleged discrimination and retaliation following that incident.  (*See* Doc. 42 at 3 ("Plaintiff's injuries

sustained in that incident are not the injuries for which Plaintiff is seeking compensation in this lawsuit.").)

In any event, Plaintiff's injuries from the 2007 radiation exposure incident were predominantly physical in nature, as demonstrated by her deposition testimony and responses to discovery requests.  (*See* Doc. 34-2 at 3-4 (stating that the only time Plaintiff saw a psychiatrist was during a single visit based on her attorney's advice following the radiation incident "for documentation [purposes] in case [her legal action] went forward" and not for purposes of treatment); Doc. 34-3 at 6 (listing a number of physical conditions caused by the radiation exposure and stating that Plaintiff is "in pain 24 hours a day"); Doc. 34-4 at 2-3 (listing a number of diagnoses and symptoms).)

Moreover, even assuming that Plaintiff's mental symptoms could be separated from her physical symptoms resulting from the radiation exposure, the documents submitted by Defendant do not support a claim for extreme emotional distress.  Instead, it appears that Plaintiff is merely claiming damages for "garden variety" emotional distress, which is quite intertwined with her physical ailments.[2] (*See, e.g.*, Doc. 34-4 at 2-3 (listing, among many other physical symptoms, dizziness, loss of balance, slow reflexes, lack of appetite, lack of sleep, lack of sensation, lack of concentration, lack of comprehension, agitation, nervousness,

---

[2] It should be noted that Plaintiff's symptoms were recorded in her journal entries from 2007 and 2008, many years before her termination in 2018, and she has not included them in her Complaint.

mental disorientation, confusion, trouble deciphering or writing written words,

zoning out, staring into space, constant blinking, "feeling dumb," and having

problems with addition or subtraction), 7-9, 15 ("I get very confused. . . . I feel

very disoriented.  My patience is short[,] and I cannot think clearly when one or

more people are talking."), 16 ("I feel like I am in a fog mentally.  . . .  I feel dizzy

and my balance is off.  I catch myself, repeating sentences or words, two or three

times in a row.  . . .  I made several statements that made absolutely no sense

today.  . . .  My head feels very dense and heavy, I feel confused, almost

drugged.  I ate lunch today but feel [sic] nauseated afterwards like I needed to

vomit.  I find myself staring into space.  I actually fell over at work and almost

fainted once.  . . .  I am mentally exhausted after concentrating at work all week

long."), 17 ("I did not feel well enough to talk.  My neck hurts and it feels like I

have no brain.  I feel stupid but I know I am not or am not supposed to be.  It

helps to rock back and forth to concentrate.  . . .  My eyes are so heavy.  I feel

like I am 80 years old instead of 47.  . . .  I felt disoriented from the moment I

woke up.  My head feels very heavy.  . . .  I feel drugged and stupid.  . . .  I feel

like I am progressively getting worse and my body is changing physically"), 18-19

("I find myself blinking a lot to concentrate.  My body, face, arms, legs, & feet are

burning.  My hands and feet feel numb.  My hands are very cold to the touch.  I

ran to the bathroom[,] but the diarrhea was not as intense.  My limbs feel heavy

and I feel slow."), 30 ("I have the usual symptoms.  I have noticed during this time

fatigue has increased, the burning, throbbing, and numbness as well.  Diarrhea

and loss of bladder and BM control.  Headaches, mental disconnection.

Incoordination of limbs.  Heaviness of limbs.  Discomfort of my abdomen.  Lack

of appetite.  Lack of energy.  Incredible irritability.  I have no patience left.  A lot

of this is due to 24[-]hour pain, throbbing and burning.  . . .  My usual personality

is not there[,] and I feel like half of a person."), 31 ("I had an accident out in the

field this morning.  I could not make it back to the restroom in time.  Then it

happened again, before I left for work.  I was inside and almost didn't make it to

the restroom.  When I got to work, it almost happened again.  . . .  I feel very

disconnected and weak."), 33 (noting that the most recent ultrasound showed a

nodule on the left side of Plaintiff's neck, which, according to the physician, was

possibly caused by the radiation exposure), 34 ("I am half of the person that I

was and I feel it physically, emotionally, and mentally.  It has now been a year

and nine months approximately and I am not better, I am getting worse overall."),

35 ("My hands, arms, feet, and legs throb with no relief.  Pain medicine will not

touch it.  My head hurts so bad I can hardly type this.  I am constantly running to

the restroom for lack of control.  . . .  I no longer trust my reflexes and dropped

my coffee on myself this morning.  Last week, I fell down the stairs at home

because my leg just quit working.  . . .  I had two near misses last week in my

car.  One I lost control and ran off the road, the other I almost got hit from behind

and I didn't even see the person.").)

        Defendant also asserts that Plaintiff's deposition testimony and discovery

responses seem to indicate that she has paranoia about certain events, which

would further support the need for a mental examination.  The Court is not

persuaded by this argument in light of the current record before the Court.  (*See*

Doc. 34-2 at 6 (stating that Rick Mills, Plaintiff's former supervisor at Seminole

Electric, told her that the company "had a goon squad" that intimidated anyone

who "got out of line or caused problems"); Doc. 34-3 at 21 ("I had been harassed

on and off the job and was so sick from the radiation."); Doc. 34-4 at 14 ("Rick . .

. said that we had experienced problems with someone coming into the HR

Offices.  . . .  [T]here had been tampering of documents in the office and files.  As

well as on my computer.  Password lock-outs/changes & removal from

GroupWise.  Folders within GroupWise changed allowing access by other

employees to confidential information."), 30 ("I am upset because some[one] hurt

my horse, Cheyenne[,] today.  His halter was off, [his] right eye and entire left

side of [his] head [were] swollen.  Also[,] neck atrophied, contracted.  What kind

of person could do such a thing[?]  Found [sic] [the] halter in [the] pasture and

hoof prints where [an] apparent struggle took place.  Also [sic] found imprint of a

big shoe in the dirt and a large log/branch.  The vet came and said [] it appeared

that there had been [a] blunt trauma to his neck/head/legs and that the nerves

being pinched was creating a stroke affect [sic] on the left side of his face.  This

is very upsetting, also because my home has been entered numerous times

without any signs of forced entry.  I have not logged these incidents because it is

too much to deal with on top of my health.  I feel it is all related."), 31 ("I went

outside and spotted something on the other side of the road from my home.  It

was dark so I wasn't sure what it was.  When I kept staring at the object, it got up and moved.  It was a man, he jumped up and quickly walked away down the road."), 34 ("House broken into.").)

Based on the foregoing, Defendant has not shown that Plaintiff has placed her mental condition in controversy for the purpose of authorizing a Rule 35(a) mental examination.  As such, the Court need not address the "good cause" requirement under the rule.  Finally, the Court notes that even if the two key predicates for ordering a Rule 35(a) examination were satisfied in this case, the Court could still exercise its discretion to disallow the requested examination given that the present Motion does not detail the "manner, conditions, and scope of the examination."  Fed.R.Civ.P. 35(a)(2)(B); *see also FLTVT, LLC*, 2007 WL 9719122 at *2 (noting that the court could not assess whether the proposed examination was appropriate because the motion did not detail the "manner, conditions and scope of the examination"); *cf. Stevenson*, 201 F.R.D. at 554 (instructing defendants to submit a motion and a proposed order, "specifying the 'time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made' as required under Rule 35(a)").

Accordingly, it is **ORDERED**:

The Motion (**Doc. 34**) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida, on December 7, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record